IN THE UNITED STATES DISTRICT COURT
DISTRICT OF SOUTH CAROLINA
COLUMBIA DIVISION

| | | |
|---|---|---|
| BONNIE SMITH, | ) | C/A No. 3:02-4179-JFA-BM |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| -versus- | ) | **REPORT AND RECOMMENDATION** |
| | ) | |
| LAIDLAW TRANSIT, INC., DART | ) | |
| TRANSPORTATION,[1] | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

This action has been filed by the Plaintiff, <u>pro se</u>, pursuant to the Americans with Disabilities Act (ADA), 42 U.S.C. § 12101, <u>et. seq.</u>.    Plaintiff also alleges that, if she is successful in this action, she is entitled to remedies as provided in the Rehabilitation Act of 1973, 29 U.S.C. § 794a(a)(1), 42 U.S.C. § 1983, and Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e, <u>et. seq.</u>[2] Plaintiff also contends that the Defendant is subject to sanctions for being in contempt of this Court, and that she is further entitled to financial relief under a negligence

---

[1]The Defendant Laidlaw Transit Services, Inc. (Laidlaw) formerly operated the Dial-A-Ride-Transit (DART) System in Richland County, South Carolina. There is no separate legal entity known as DART Transportation; therefore, the actual Defendant in this case is Laidlaw.  The DART System is an ADA complementary paratransit service system which was operated by Laidlaw through a contract with South Carolina Electric & Gas Company (SCE&G), which operated the regular bus system.  Laidlaw's contract expired on November 1, 2002, and it has not operated the DART system since that date. <u>Gauthier Affidavit of August 29, 2003 (Defendant's Appendix 6)</u>.

[2]Defendant states in its brief that Plaintiff fails to identify what portion of the Civil Rights At of 1964 she alleges has been violated.  However, on page two of her amended Complaint, Plaintiff specifically references Title VII of this Act as providing a remedy for her claims.

1



theory, harassment, the South Carolina Victims Bill of Rights, and the South Carolina Bill of Rights Act for Handicapped Persons.

The Defendant filed a motion for summary judgment pursuant to Rule 56, Fed.R.Civ.P., on September 2, 2003.  As the Plaintiff is proceeding pro se, a Roseboro order was entered by the Court on September 4, 2003, advising Plaintiff of the importance of a motion for summary judgment and of the necessity for her to file an adequate response. Plaintiff was specifically advised that if she failed to respond adequately, the Defendant's motion may be granted, thereby ending her case.  Plaintiff thereafter filed a response to the Defendant's motion on September 26, 2003, to which the Defendant filed a motion to strike on October 2, 2003.  The Defendant also filed a reply memorandum in support of its motion for summary judgment on October 2, 2003, to which the Plaintiff filed reply memoranda on October 6, 14, and 25, 2003.

On June 24, 2004, the undersigned entered an order staying this case pending resolution of Culler, et al. v. South Carolina Electric & Gas, et al., C/A No. 3:02-2803-17, a class action involving some of the same issues presented in this case.  See Order filed June 24, 2004. On April 6, 2005, after having been advised that a settlement agreement had been entered in Culler involving the injunctive portion of that case, but that resolution of those claims had not resulted in a resolution of the claims asserted by the Plaintiff in this case, the undersigned entered an order re-opening this case and granting the parties ten (10) days to submit any supplemental filings to the Court to be considered as part of the Defendant's pending motion for summary judgment.

Plaintiff thereafter filed a supplemental response on April 14, 2005, with the Defendant filing a supplemental memorandum on April 18, 2005.  Plaintiff filed an objection to Defendant's supplemental memorandum on April 25, 2005. The pending motions are now before

2



the Court for disposition.[3]

### Background and Evidence[4]

Plaintiff alleges in her Complaint that she is an individual with a disability as defined by the ADA.  Plaintiff alleges that the Defendant operates pursuant to a contract with South Carolina Electric & Gas (SCE&G) to provide public transportation to persons suffering from disabilities within Richland County, South Carolina.  Plaintiff further alleges that pursuant to a previous order of this Court in <u>Smith v. DART Transpiration, et al.</u>, C/A No. 3:97-1864, the Defendant was ordered to "fully comply with all applicable provisions of the Americans with Disabilities Act, 42 U.S.C. § 1281, <u>et. seq.</u>, and all regulations promulgated thereunder," but that the Defendant has "willfully disobey[ed] and disregard[ed] this Court order and cause[d] the Plaintiff grievous harm."[5]  Specifically, Plaintiff alleges that she uses a three wheel scooter, but

---

[3]This case was automatically referred to the undersigned United States Magistrate Judge for all pretrial proceedings pursuant to the provisions of 28 U.S.C. § 636(b)(1)(A) and (B) and Local Rule 73.02(B)(2)(e) and (g), D.S.C.  The Defendant has filed a motion for summary judgment. As this is a dispositive motion, this Report and Recommendation is entered for review by the Court.

[4]The facts and evidence are considered and discussed hereinabove in the light most favorable to the Plaintiff, the party opposing summary judgment. <u>Pittman v. Nelms</u>, 87 F.3d 116, 118 (4th Cir. 1996).

[5]Plaintiff's request that the Defendant be held in civil contempt arises out of her assertion that the Defendant has violated the terms of the order dismissing C/A No. 3:97-1864.  However, the undersigned does not find that it would be appropriate to address Plaintiff's civil contempt request in the lawsuit at bar. In addition to C/A No. 3:97-1864, Plaintiff has filed two additional cases in this Court against essentially this same Defendant. In <u>Smith v. DART Transit, et al.</u>, 3:00-941-17BD, Plaintiff alleged that the Defendant offered false testimony in Plaintiff's first case and deprived Plaintiff of her civil rights. In <u>Smith v. South Carolina Electric & Gas, et al.</u>, 3:02-268-19BD (which also included additional new Defendants), Plaintiff asserted a claim of civil conspiracy as well as fraud and negligence claims.  Both of those cases were dismissed by the Court as legally frivolous. <u>Aloe Creme Laboratories, Inc. v. Francine Co.</u>, 425 F.2d 1295, 1296

3



that on more than one occasion she has not been provided with a shoulder belt when one was requested in order that her scooter could be transported in the DART van more safely, and that even after meeting with DART officials concerning this matter, on her next trip the driver was still unable to provide a seatbelt or secure the scooter.  Plaintiff also complains that she "continually experiences trip refusals," and has difficulty scheduling rides because she is given a "standby" time

---

(5th Cir. 1970) [This Court may take judicial notice of its own records.].  Plaintiff now includes a request that the Defendant be held in civil contempt in this, her fourth, lawsuit concerning operation of the DART System.  However, a review of the final order in C/A No. 3:97-1864 reveals that Plaintiff actually lost that case on her damages claims, with no findings being made as to whether there had been any violations of any applicable ADA standards by the Defendant for purposes of any injunctive relief.  See Plaintiff's Exhibit 1.  That order did provide that the Defendants in that case were to fully comply with the applicable provisions of Title III of the ADA, 42 U.S.C. § 1281, et. seq., and all regulations promulgated thereunder, in their operation of the DART System. Id.  However, if Plaintiff believes that a Defendant from C/A No. 3:97-1864 (the Defendant here asserts that it is a separate legal entity from the "Laidlaw" Defendant in that earlier case) has willfully failed to comply with that order, the undersigned finds that the more appropriate procedure would be for her to file a civil contempt motion in that earlier case. *Cf.* In re Stewart, 571 F.2d 958, 963 (5th Cir. 1978) [civil contempt is a facet of a principal suit]; In re Timmons, 607 F.2d 120, 128 (5th Cir. 1979) [A civil contempt proceeding is a facet of the original cause of action]; Roe v. Operation Rescue, 919 F.2d 857, 869 (3rd Cir. 1999) ["civil contempt proceedings are part of the underlying action…"]; Gompers v. Bucks Stove & Range Co., 211 U.S. 418, 445 (1911) ["Proceedings for civil contempt are between the original parties and are instituted and tried as part of the main cause"].  In addition to the question of applicability of the order in C/A NO. 3:97-1864 to this Defendant, the Defendant also raises the issue of whether Plaintiff was even the prevailing party in that action. See Ashcroft v. Conoco, Inc., 218 F.3d 288, 300 (4th Cir. 2000) [To establish civil contempt, one element that must be shown is that "the decree [at issue] was in the movant's 'favor'"].  These issues are all intricately a part of what happened in that prior litigation, which involved (allegedly) different parties, as well as different attorneys, and even a different judge from the undersigned.  Plaintiff's present litigation, which includes numerous and different causes of action, is not the appropriate avenue to address these issues. *Cf.* McGee v. Illinois Dept. of Transportation, No. 02-C-0277, 2002 WL 31478261, *6-8 (Nov. 5, 2002) N.D.Ill.) [noting that the court's civil contempt authority provides a different panoply of rights and remedies to an allegedly aggrieved person than does filing a separate lawsuit, and that the Plaintiffs "made a conscious decision to forego [the benefit of obtaining a prompt remedy by way of a civil contempt proceeding] and to file instead [a] separate lawsuit which affords certain rights, procedures and remedies not available in a civil contempt proceeding"].

4



schedule. Plaintiff complains that "[e]ven calling for a scheduled ride two weeks ahead does not give the client a ride or reasonable time." Plaintiff also complains about the defense presented by the Defendant to the jury in her previous case, complaining that this defense was a "plot...to convince the jury that under the circumstances they were not negligent." Plaintiff then goes on to assert the following causes of action in her Complaint: Discrimination in Public Transportation and violation of Civil Rights (First Cause of Action), Negligence and Civil Rights - Violation I (Second Cause of Action), Negligence and Civil Rights - Violation II (Third Cause of Action), and Harassment and Civil Rights Violation (Fourth Cause of Action). Plaintiff seeks both monetary and injunctive and/or declaratory relief. See generally Complaint.

Defendant does not dispute for purposes of summary judgment that Plaintiff requires use of a three wheeled scooter to get around when she leaves her home, but denies that it is liable to Plaintiff under any legal theory. Defendant has presented evidence to show that Plaintiff complained in a letter dated November 12, 2000 that she had requested a ride two days in advance and received a confirmed pick-up at 11:00 a.m. for a trip to the Richland Fashion Mall, but that when her DART vehicle was forty minutes late, she had called the DART office and spoken to Jim Gauthier, who told her she had an 11:45 pick-up time and a standby return time of 2:30 p.m. See Defendants' Appendix 7. The Defendant's records reflect that Plaintiff was picked up at 12:10 p.m., and was then picked up at the mall at 2:30 p.m. for the return trip. Defendants' Appendices 7 & 8. Over the course of the next two years, Defendant's evidence shows that Plaintiff rode the DART system on ten additional occasions. Gauthier Affidavit of August 29, 2003, ¶ 11; Appendix 8; Plaintiff's Deposition II, p. 114. Plaintiff testified that she also requested a ride on five (5) other occasions, but that her requests were denied. Apparently on at least some of those occasions,

5



Plaintiff was given a standby trip, whereupon she would cancel the trip request. Plaintiff did not remember details about the remaining entries. <u>Plaintiff's Deposition II</u>, pp. 39-43; <u>Defendant's Exhibit 6</u>.

   With respect to the times Plaintiff did ride the DART service, Plaintiff testified that on November 29, 2000 she required transportation to Stoneridge Drive. <u>Plaintiff's Deposition I</u>, p. 25. The Defendant's records indicate that Plaintiff was picked up nine minutes prior to her scheduled departure time, was dropped off twenty-one minutes before her projected arrival time, and was picked up early for her return trip home. <u>Defendant's Appendix 8</u>. Plaintiff, however, testified that she remembered having to wait an hour late at night for the return ride home. <u>Plaintiff's Deposition I</u>, p. 26. Plaintiff also used the DART system on November 30, 2000, February 24, 2001, February 27, 2001, March 5, 2001 and March 10, 2001. During these rides, Plaintiff testified that on one occasion she had to ride without a shoulder belt, and that on another occasion (apparently the March 10th trip) the driver had difficulty strapping her scooter down correctly. <u>Plaintiff's Deposition II</u>, pp. 99-100, 150; <u>see</u> <u>Defendant's Appendix 8</u>. With respect to the March 10th trip, the driver's inability to strap the Plaintiff's scooter down correctly caused a delay of one to two hours, during which Laidlaw's training supervisor (Carroll House) and another Laidlaw employee (Francina Smith) came to the scene to assist. <u>Plaintiff's Deposition II</u>, p. 100. The van in which Plaintiff was to travel did not have the correct length of shoulder belt, and Plaintiff testified that during the course of the delay, Francina Smith told her in a "nasty" tone that it was not safe for her to ride in her scooter, and that she should "get out of your scooter and transfer to a seat." Plaintiff refused to move. <u>Plaintiff's Deposition II</u>, pp. 100-101, 107. House and Jim Gauthier, manager of the Defendant's Columbia operations, then met with the Plaintiff on

6



or about March 21, 2000 to review this incident and the proper way for Plaintiff's scooter to be strapped down, at which time photographs were taken. <u>Plaintiff's Deposition II</u>, pp. 99, 103; <u>Gauthier Affidavit of August 29, 2003</u>, ¶ 12.

Plaintiff thereafter used the DART system again on May 16, 2001, June 13, 2001, July 9, 2001, and August 8, 2002. <u>Gauthier Affidavit of August 29, 2003</u>, ¶ 11; <u>Defendant's Appendix 8</u>. During her trip on August 8, 2002, Plaintiff testified that she was picked up thirty (30) minutes early, causing her to have to wait when, as a consequence, she arrived early for her scheduled appointment. <u>Plaintiff's Deposition II</u>, pp. 176-177.

In her response to the Defendant's motion for summary judgment, Plaintiff continues to complain about the handling of her first lawsuit and the Defendant's actions in that lawsuit. Plaintiff also complains that the Defendant destroyed evidence of her trip dates from 1999, and are not producing all of the operators' manifests or records of Plaintiff's trips. Plaintiff claims that all of the records of trips taken in 1999 are missing, although she rode the DART system in 1999,[6] and that some of the operator manifests for the years 2000 through 2002 are also missing. <u>See Plaintiff's Deposition II</u>, pp. 55, 105, 183. Plaintiff also has attached as Plaintiff's Exhibit 4 a copy of her letter to Jim Gauthier of November 12, 2000 complaining about her scheduled trip of November 8, 2000, in which she complains that she had to sit "at the roadside in my wheelchair for forty minutes waiting for my ride." Plaintiff complains in that letter about having to endure "standby" service. With respect to the number of times Defendant contends Plaintiff used the DART service, Plaintiff responds that if the Defendant "had not been operating with capacity

_____

[6]Defendant contends that Plaintiff did not begin using the DART System again (after ceasing to use it earlier) until 2000, not 1999.



constraint and continuous trip denials Plaintiff would have ridden DART five and six days a week over the course of the past four years." Plaintiff has also presented as her Exhibit 6 a listing of purported untimely pick-ups and drop-offs, as follows: November 10, 2000 (driver was over an hour late, schedule was changed without notification), February 24, 2001 (driver unable to secure scooter, Plaintiff sat in van for over one hour waiting for help to arrive), February 24, 2001 (driver forty-five minutes late making pick-up from mall), March 10, 2001 (driver over one hour late for pick-up, Plaintiff had to ride on van for two hours), May 16, 2001 (driver twenty-nine minutes early), July 9, 2001 (driver thirty-eight minutes early), August 8, 2002 (driver thirty minutes early). Plaintiff has also submitted affidavits from other individuals, who attest that either they have had similar problems with the DART service, or support Plaintiff's claims concerning her problems with the DART service. See generally, Plaintiff's Exhibit 11.[7]

        Both parties' in their original reply memoranda further discuss the arguments and evidence presented in their initial memoranda. In her supplemental filing of April 14, 2005, Plaintiff has submitted a copy of the April 26, 2004 partial order of dismissal in Culler, which Plaintiff argues "demonstrates the similarly of Culler et al., case and Smith v. Laidlaw, et al. case." Plaintiff further argues that in this order, Chief United States District Judge Joseph Anderson found that a private entity that contracts with a public entity must comply with the provisions of the ADA, and that Laidlaw was accountable under the ADA and the Rehabilitation Act. Plaintiff has further submitted as a separate exhibit a copy of a letter to her from counsel for

---

[7]The Defendant's pending motion to strike relates to many of the exhibits Plaintiff has submitted with her memorandum in opposition to the Defendant's motion for summary judgment. In light of the recommended disposition of this case, the undersigned has not ruled on that pending motion, as it will be moot if the Report and Recommendation is adopted by the Court.



the plaintiffs in <u>Culler</u>, in which counsel states that damages for the named Plaintiffs in Culler were

negotiated with SCE&G, but that those agreements should not bar individual damage claims by

anyone other than the individual plaintiffs named in that lawsuit.  In its supplemental memorandum,

the Defendant also discusses Chief Judge Anderson's ruling in <u>Culler</u>, and presents arguments

concerning how that order affects the case at bar.

### <u>Discussion</u>

Summary judgment "shall be rendered forthwith if the pleadings, depositions,

answers to interrogatories, and admissions on file, together with the affidavits, if any, show that

there is no genuine issue as to any material fact and that the moving party is entitled to judgment

as a matter of law."  Rule 56(c), Fed.R.Civ.P.  The moving party has the burden of proving that

judgment on the pleadings is appropriate.  Once the moving party makes this showing, however,

the opposing party must respond to the motion with "specific facts showing there is a genuine issue

for trial."  Rule 56(e), Fed.R.Civ.P.   Further, while the Federal Court is charged with liberally

construing a complaint filed by a <u>pro</u> <u>se</u> litigant to allow the development of a potentially

meritorious case, <u>see</u> <u>Cruz v. Beto</u>, 405 U.S. 319 (1972); <u>Haines v. Kerner</u>, 404 U.S. 519 (1972),

the requirement of liberal construction does not mean that the Court can ignore a clear failure in

the pleadings to allege facts which set forth a Federal claim, nor can the Court assume the existence

of a genuine issue of material fact where none exists.  <u>Weller v. Dep't of Social Services</u>, 901 F.2d

387 (4th Cir. 1990).

### I.

### (ADA Claim)

Plaintiff asserts, <u>inter</u> <u>alia</u>, that the Defendant has violated the ADA.  In considering

9



this claim, the initial issue confronted by the Court is what provisions of the ADA apply in this case, if any.  Defendant contends that Title III of the ADA, 42 U.S.C. § 12181, <u>et. seq.</u>, dealing with public accommodations and services operated by private entities, applies to this case, but notes that many of the regulations cited to by the Plaintiff in her amended Complaint fall under Title II of the ADA, 42 U.S.C. § 12131, <u>et. seq.</u>, which deals with public services.  Defendant argues that Title II is not applicable in this case because that Title deals only with public entities.  In her memorandum opposing summary judgment, Plaintiff concedes that she does not know whether the Defendant is subject to Title II of the ADA, but argues that if she cannot obtain monetary damages under that Title, she is still entitled to monetary damages pursuant to the other statutes and violations listed in her amended Complaint.

        It is instructive to note that, with respect to Plaintiff's argument that the Defendant should be held in contempt for being in violation of Judge Anderson's order in <u>Smith v. Dart Transportation, et. al</u>, C/A No. 3: 97-1864, that that order required the Defendant to "fully comply with all applicable provisions of the Americans with Disabilities Act, 42 U.S.C. § 12181, <u>et. seq.</u>, and all regulations promulgated thereunder." <u>See</u> <u>Plaintiff's Exhibit 1</u>.  Section 12181, <u>et. seq.</u>, is, of course, Title III of the ADA. The undersigned further notes that in his April 26, 2004 order in <u>Culler</u>, Judge Anderson found that the corporate defendants in that case (which included Laidlaw) were not public entities and were therefore not subject to Title II of the ADA.  <u>See</u> <u>Culler Order</u>, at pp. 13-14.   This finding is entitled to preclusive effect in the case at bar. *See* <u>Aloe Creme Laboratories, Inc. v. Francine Co.</u>, <u>supra</u>, where the United States Court of Appeals for the Fifth Circuit commented:

        The District Court clearly had the right to take notice of its own files and records and

10



it had no duty to grind the same corn a second time.  Once was sufficient.

Aloe Creme Laboratories, Inc. v. Francine Co., supra, 425 F.2d at 1296. Therefore, the undersigned has considered Plaintiff's ADA claims herein only under Title III of that Act.

Under Title III, Plaintiff is limited to equitable relief.  O'Conner v. Metro Ride, Inc., 87 F.Supp.2d 894, 899, n. 2 (D.Minn. 2000); Pona v. Cecil Whittaker's, Inc., 155 F.3d 1034, 1038-1039 (8th Cir. 1998); Klinger v. Dep't of Revenue, 281 F.3d 776 (9th Cir. 2002).  Since it is undisputed that the Defendant Laidlaw is no longer involved with the operation of the DART system, there is no equitable or declaratory relief which could be granted against this Defendant. Therefore, the Defendant is entitled to dismissal of Plaintiff's ADA claim because there is no injunctive or declaratory relief available which would apply to this Defendant. Chambers v. Melmed, No. 04-1130, 141 Fed.Appx. 718, 720 (10th Cir. 2005) ["A request for prospective relief can be mooted by a Defendant's voluntary cessation of the challenged activity if it is 'absolutely clear the alleged wrong behavior could not reasonably be expected to recur.'"] (quoting Friends of the Earth, Inc. v. Laidlaw Envt'l Servs, 528 U.S. 167 (2000) (quotation omitted)); Disabled Rights Committee v. Fremont Street Experience Limited Liability Co., No. 01-16657, 44 Fed.Appx. 100, 103 (9th Cir. 2002).

## II.

## (Rehabilitation Act Claim)

Plaintiff also asserts that she is entitled to relief under the Rehabilitation Act.  Under this Act, "[n]o otherwise qualified individual with a disability in the United States,...shall, solely by reason of her or his disability, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance...." 29 U.S.C. § 794(a).



Defendant argues that it is not subject to suit under this Act because it is not a "program or activity" under the statute, nor does it receive federal financial assistance.[8]  However, the Defendant clearly operated a "program or activity" for purposes of a Rehabilitation Act claim because it operated the DART system during the relevant time period. See 29 U.S.C. § 794(b)(3) [defining "program or activity" as "all of the operations of an entire program...if assistance is extended to such corporation...as a whole...."]; Schrader v. Fred A. Ray, M.D., P.C., 296 F.3d 968, 971 (10th Cir. 2002). Hence, the only question is whether the Defendant received federal financial assistance in its operation of the DART system.

Frank Ciccarella, the Defendant's Vice-President of Safety and Security, attests that the Defendant was not the direct recipient of any federal funds, nor were any subsidies received from the federal government. Ciccarella Affidavit (Defendant's Appendix 5). The facts before this Court show that SCE&G operated a fixed-route public transportation system in Richland County, South Carolina pursuant to a franchise agreement with the City of Columbia and/or the State of South Carolina, and that SCE&G in turn contracted with the Defendant to provide a complimentary paratransit system (DART). See Exhibit A to Gauthier Affidavit of October 18, 2005 (hereinafter "Supplemental Gauthier Affidavit"). Pursuant to this contract, Defendant was provided a specified sum for a specified number of hours per month and a per vehicle hour cost for additional hours.  The vehicles used in the DART system were owned by the Central Midlands Regional Planning Council (CMRPA), and Gauthier attests that these vehicles were leased from CMRPA by the Defendant.

---

[8]Unlike the question of the applicability of the ADA to this Defendant, Judge Anderson did not resolve the question of whether this Defendant was subject to the Rehabilitation Act in his April 26, 2004 order in Culler, deciding instead that the Defendants had not met the standard for dismissal necessary under a Rule 12 motion to dismiss.



<u>Gauthier Affidavit of August 29, 2003 (Defendant's Appendix 6)</u>; <u>Gauthier Supplemental Affidavit, and Exhibit A, Art.I, Sub¶ 11, Exhibit B</u>. Defendant argues this evidence shows that it only provided the DART service contractually through its contract with SCE&G, another private entity, and that compensation received pursuant to a contractual relationship to provide services does not constitute receipt of federal financial assistance for purposes of a Rehabilitation Act claim. <u>See</u> <u>O'Connor</u>, 87 F.Supp.2d at 897-898; <u>Jarno v. Lewis</u>, 256 F.Supp.2d 499, 504 (E.D.Va. 2003) ["procurement contracts do not constitute federal financial assistance where the recipient receives no government subsidy for its service but rather acts solely as a market participant"].

Plaintiff's argument that the Defendant received federal financial assistance is based on Defendant's use of the vehicles owned by CMRPA. Plaintiff disputes that the Defendant leased these vehicles from CMRPA, pointing to deposition testimony of John Gardner (a Laidlaw manager) from her previous litigation, <u>Smith v. DART Transportation, et al.</u>, C/A No. 3:97-1864. In that deposition, Gardner testified that "the funding for the vehicles came through Central Midlands Council of Governments and they actually procured the vehicles....We didn't have to do the maintenance on the vehicles. We didn't procure the vehicles. The vehicles were purchased with federal grant funds that were matched by SCE&G so Laidlaw didn't have any investment in capital for the vehicles. We were compensated monthly for our fixed costs....the only variable costs we really had were costs for drivers." <u>Plaintiff's Exhibit 8</u>, pp. 75, 78.[9] Plaintiff argues that this testimony demonstrates that the Defendant received federal financial assistance in the operation of

---

[9]Defendant has moved to strike this exhibit, complaining that Plaintiff has only offered a small portion of Gardner's deposition testimony from this previous case. Defendant argues that this small portion of the cited testimony provides no context, and therefore only serves to mislead the Court.



the DART program through "use of these vehicles....vehicle maintenance, parking space and gas and other assistance." See Plaintiff's Reply to Defendant's Summary Judgment, p. 15. Plaintiff quotes 49 C.F.R. § 27.5, which defines federal financial assistance as "any grant, loan, contract (other than a procurement contract or a contract of insurance or guaranty), or any other arrangement by which the Department provides or otherwise makes available assistance in the form of (c)...personal property or any interest in, or use of such property....". 49 C.F.R. § 27.5(c).

After careful consideration of these arguments, the undersigned is constrained to agree with the Defendant that it is not under the circumstances of this case a recipient of federal financial assistance such as to make it subject to suit under the Rehabilitation Act. The facts and evidence presented to this Court clearly show that the Defendant was operating the DART system pursuant to a procurement contract with SCE&G for the provision of this service. Although the lease agreement for the vehicles was for only one ($1.00) dollar, the Defendant was required to maintain all insurance, with SCE&G being responsible for vehicle maintenance and repairs, all pursuant to a contract for which Defendant was paid. Gauthier Supplemental Affidavit, Exhibit A. Whatever the lease amount, it nevertheless remains the fact that these vehicles were provided pursuant to a contract entered into by the Defendant to provide these services, and for which the Defendant received compensation.

"While Rehabilitation Act coverage extends to both direct and indirect recipients of federal funds, it does not follow the federal aid past the intended recipient to those who merely derive a benefit from the aid or receive compensation for services rendered pursuant to a contractual arrangement." Hamilton v. Illinois Central Railroad Company, 894 F.Supp. 1014, 1022 (S.D.Miss. 1995). Here, the obtaining of vehicles to operate the DART System, under whatever terms, was part

14



of the contractual agreement between the parties. The amount charged for the lease of the vehicles was only one part of that contractual relationship, and if the lease payments had been higher, the Defendant could in turn have required higher monthly compensation from SCE&G. In any event, the Court is not required to act as an accountant. DeVargas v. Mason & Hanger Silas Mason Co., Inc., 911 F.2d 1377, 1382 (10th Cir. 1990) ["In determining whether a party has obtained federal financial assistance under section 504, we decline to scrutinize the fair market value of every transaction as if we were article III accountants."], cert. denied, 498 U.S. 1074 (1991).

There has been no showing that the Defendant was paid over market value for its services resulting in it being an indirect recipient of federal financial assistance. Under these facts, the Defendant was not a recipient of federal financial assistance for purposes of a Rehabilitation Act claim, and cannot therefore be sued under that Act.

### III.

### (Claims Under Title VII and/or § 1983)

In the "jurisdiction" section of Plaintiff's amended Complaint, she cites Title VII of the Civil Rights Act of 1964 and/or 42 U.S.C. § 1983 as being jurisdictional bases for maintenance of this lawsuit. However, Title VII of the Civil Rights Act does not generally apply to disability claims, which is at least in part why Congress enacted the separate Americans with Disabilities Act, previously discussed. Nicastro v. Runyon, 60 F.Supp.2d 181, 185 (S.D.N.Y. 1999) [Title VII "does not cover claims of disability discrimination."]; see also 42 U.S.C. § 2000e-2; Rivera v. Heyman, 982 F.Supp. 932, 939-940 (S.D.N.Y. 1997), aff'd in part, rev'd in part on other grounds, 157 F.3d 101 (2d Cir. 1998). Plaintiff has not claimed in this lawsuit that she has been discriminated against on the basis of her race, sex, or any other ground applicable under Title VII. Therefore, to the extent



Plaintiff has intended to assert any of her claims set forth in the amended Complaint under Title VII of the Civil Rights Act of 1964, such claims (as asserted under that statute) are subject to dismissal.

With respect to § 1983, this statute is the procedural mechanism through which Congress provided a private civil cause of action based on allegations of federal constitutional violations by persons acting under color of state law. See Jennings v. Davis, 476 F.2d 1271 (8th Cir. 1973). The purpose of § 1983 is to deter *state actors* from using their badge of authority to deprive individuals of their federally guaranteed rights, and to provide relief to victims. See McKnight v. Rees, 88 F.3d 417, 419 (6th Cir. 1996). In order to state a cause of action under § 1983, a plaintiff must allege *both* that 1) the Defendant deprived him or her of a federal right, and 2) did so under color of state law. Gomez v. Toledo, 446 U.S. 635, 640 (1980). Here, the Defendant is a private company, not a state actor. *Cf.* Hinman v. Lincoln Towing Services, Inc., 771 F.2d 189, 193 (7th Cir. 1985) [A private person does not become a state actor merely by performing a function which serves the public]. No unlawful conduct by a state actor has been alleged, and purely private conduct, no matter how wrongful, injurious, or discriminatory, is not actionable under § 1983. See Lugar v. Edmondson Oil Co., 457 U.S. 922, 936 (1982); Burton v. Wilmington Parking Authority, 365 U.S. 715, 721 (1961).

Therefore, to the extent Plaintiff has intended to assert violations of Title VII or § 1983 in this lawsuit, any such claims should be dismissed.

## IV.

### (Negligence Claim)

Plaintiff also asserts claims for negligence in her amended Complaint. Specifically, Plaintiff claims that the Defendant was negligent in its driver training because not all drivers were

16



familiar with the use and application of a shoulder belt, negligent by not having the proper length of securement belts in vans to secure Plaintiff's scooter, and negligent in refusing "many trip requests made by the Plaintiff....". See Plaintiff's Second and Third Causes of Action. Plaintiff also alleges that the Defendant has been "negligent in [its] business plans and performance of duties to provide transportation for qualified persons with disabilities." Amended Complaint, ¶ 17.

In order to prove negligence in South Carolina, Plaintiff must prove by a preponderance of the evidence that 1) the Defendant had a legal duty of care; 2) the Defendant failed to discharge that duty; and 3) Defendant's breach proximately caused her injury. Goode v. St. Stephens United Methodist Church, 494 S.E.2d 827, 834 (S.C. 1997); Bailey v. Segars, No. 3370, 550 S.E. 2d 910, 913 (S.C.Ct.App. 2001); Hubbard v. Taylor, 529 S.E.2d 549, 552 (S.C.Ct.App. 2000). Plaintiff is required to show negligence with reasonable certainty, not through mere conjecture, and she may not attempt to prove negligence through the doctrine of res ipsa loquitur. Eickhoff v. Beard-Laney, 20 S.E.2d 153 (S.C. 1942); Crider v. Infinger Transportation Co., 148 S.E.2d 732 (S.C. 1966).

With respect to Plaintiff's claims, Defendant argues, and the undersigned agrees, that it owed no direct duty of care to the Plaintiff with respect to its "business plan", defined as the alleged failure of the Defendant to comply with terms and requirements of its contract . The Defendant had a contract to operate the DART System with SCE&G, and therefore had a contractual duty to perform as required under that contract.  However, that duty flowed to SCE&G, not to the Plaintiff or any other user of the DART System. Cf. Meddin v. Southern Ry-Carolina Division, 62 S.E.2d 109, 112 (S.C. 1950) ["if the cause of action is predicated on the alleged breach, or even negligence breach, of a contract between the parties, an action in tort will not lie"].  Nevertheless,



the Defendant may still be liable to the Plaintiff if it was negligent in its performance under the contract, and that negligence resulted in injuries or damages to the Plaintiff. *Cf.* Dorrell v. South Carolina Dep't of Transportation, 605 S.E.2d 12, 14-15 (S.C. 2004) ["A tortfeasor may be liable for injury to a third party arising out of the tortfeasor's contractual relationship with another, despite the absence of privity between the tortfeasor and the third-party....The tortfeasor's liability exists independently of the contract and rests upon the tortfeasor's duty to exercise due care."]; Kleckley v. Northwestern Nat'l Cas.Co., 498 S.E.2d 669, 672 (S.C.Ct.App. 1998) [same], aff'd, 526 S.E.2d 218 (S.C. 2000).

However, looking at Plaintiff's negligence claims, Plaintiff has presented no evidence with respect to lack of driver training in the use and application of shoulder belts, or to show that the Defendant was somehow negligent with respect to this training. Indeed, Plaintiff's allegations with respect to this claim appear to be directed more towards her claim that the shoulder belts provided were not long enough to secure her scooter, not that the drivers themselves didn't know how to operate or secure these belts. See generally, Amended Complaint, ¶¶ 8-12. In any event, assuming the Defendant had a duty of care to the Plaintiff in making sure that its van drivers were properly trained in the use of these shoulder belts, Plaintiff has provided no evidence to support her claim that the Defendant was negligent in the training of its drivers in this area. Papasan v. Allain, 478 U.S. 265, 286 (1986) [courts need not assume the truth of legal conclusions couched as factual allegations]; House v. New Castle County, 824 F.Supp. 477, 485 (D.Md. 1993) [plaintiff's conclusory allegations insufficient to maintain claim].

With respect to Plaintiff's claim that the Defendant was "negligent" by not having the proper length of securement belts in vans to secure her scooter, it is again unclear how in the abstract

18



this constitutes a negligence claim absent some type of accident or injury having occurred. According to the records provided to this Court, Plaintiff began using the DART System again in November 2000, having previously ceased using it while her first case was on appeal. <u>Plaintiff's Deposition II</u>, p. 21; <u>Gauthier Affidavit of August 29, 2003</u>, ¶ 11. Plaintiff argues that she actually began using the system again in 1999, although there are no records of her using the DART System that year. <u>See Plaintiff's Deposition II</u>, pp. 55, 105, 183.[10] Even assuming Plaintiff is correct, however, she has still presented no evidence that she incurred any injury or damages because of a lack of a shoulder or safety belt during the relevant time period.[11] <u>Plaintiff's Deposition II</u>, p. 150.

        Both Plaintiff and the Defendant refer to the same evidence concerning Plaintiff's negligence claim over the lack of a safety or shoulder belt in this lawsuit. This evidence consists of two incidents. On an unidentified trip (apparently February 24, 2001) Plaintiff had to ride without a shoulder belt, while on another occasion (March 10, 2001) the driver had difficulty strapping Plaintiff's scooter down correctly. <u>Plaintiff's Deposition II</u>, pp. 99-100, 150. There is no evidence that Plaintiff suffered any injuries with respect to the February 24, 2001 trip. As for the March 10, 2001 incident, while this caused a delay of an hour or two, there is again no evidence of any injury suffered by the Plaintiff as a result of this incident. <u>Plaintiff's Deposition II</u>, pp. 100, 150; <u>see also</u>

---

        [10]Plaintiff argues in her brief (Court Document No. 65) that the Defendant "destroyed evidence of the [1999] trip dates from their computer data and are not producing all of the operators' manifests records of Plaintiff's trips." While no evidence has been offered to substantiate this claim, for purposes of summary judgment the undersigned has assumed that Plaintiff resumed using the DART System in 1999. <u>See</u> <u>also</u> <u>Reply Appendix 1</u>, p. 4.

        [11]While Plaintiff apparently did *previously* suffer some physical injuries while using the DART System, the evidence before the Court is that those injuries occurred prior to the filing of her first lawsuit, and indeed were part of that lawsuit. <u>Plaintiff's Deposition II</u>, p. 107, <u>Defendant's Exhibit 21</u>. Any injuries Plaintiff suffered as a result of those incidents were resolved in that previous litigation, and are not part of this lawsuit, which only covers the period after 1998.



<u>Defendant's Appendix 8</u>.  On the second occasion the Defendant's training supervisor, Carroll House, and another employee, Francina Smith, came by to assist, but the van apparently was not equipped with the correct length shoulder belt.  <u>Plaintiff's Deposition II</u>, p. 100.  As a result of this second incident, House met with the Plaintiff a few days later to discuss ways to best strap down Plaintiff's scooter, during which photographs were taken.  <u>Plaintiff's Deposition II</u>, pp. 99, 103; <u>Gauthier Affidavit of August 29, 2003</u>, ¶ 12.

It is unclear to the undersigned how this series of events constitutes a "negligence" claim against the Defendant, nor has Plaintiff shown any injuries suffered as a result of any breach of a legal duty of care owed to her by the Defendant.  <u>Goode</u>, 494 S.E.2d at 834; <u>Johnson v. U.S. Government</u>, 258 F.Supp. 372, 376 (E.D.Va. 1966) [Duty of care only requires exercise of ordinary diligence under the circumstances].  If there was some evidence that the Defendant's employee improperly strapped in Plaintiff's scooter, which then resulted in an injury to the Plaintiff during her use of the DART System, perhaps a negligence claim could be maintained.  However, no such evidence has been presented to this Court.

Finally, Plaintiff's assertion of negligence in the Defendant's alleged refusal of "many trip requests made by the Plaintiff" is also without merit. First, it is again difficult to discern how this claim actually falls under a traditional "negligence" cause of action.  Further, while the record evidence before the Court shows that, during the relevant time period (from either 1999 or 2000 forward), Plaintiff had several occasions where her scheduled pick up was late, there is no record of her ever having been "refused" any trip request.  See <u>Defendant's Appendix 7 and 8</u>; <u>Gauthier Affidavit of August 29, 2003</u>, ¶ 11; <u>Plaintiff's Deposition I</u>, pp. 25-26; <u>Plaintiff's Deposition II</u>, pp. 100, 114, 175-182.   Plaintiff testified that she requested a ride on five occasions on which her



requests were denied; however, she does not remember any specifics or details about any of these five occasions, nor are there any records of any such trip denials to support this assertion.[12] Plaintiff Deposition II, pp. 39-43; see also Plaintiff's Exhibit 6. Such general and conclusory allegations, without any supporting evidence, are simply insufficient to maintain this claim, even if the Court were otherwise able to fit this claim under a "negligence" cause of action. Papasan, 478 U.S. at 286; House, 824 F.Supp. at 485 [Plaintiff's conclusory allegations insufficient to maintain claim]; Crider, 148 S.E.2d at 734-735 [Plaintiff required to show negligence with reasonable certainty, not through mere conjecture]. Additionally, Plaintiff has again failed to present any evidence of any damages suffered as a result of these alleged trip "refusals" [assuming they occurred], other than to repeat the general and conclusory allegations of her amended Complaint that she was unable to pursue work as a youth advocate or other employment or educational opportunities. Amended Complaint, ¶ 16. General and conclusory allegations, without any supporting evidence, are not sufficient to survive a motion for summary judgment.[13]

---

[12]Despite this lack of evidence specifically with regard to the Plaintiff, the general evidence does show that a small number of trip requests were denied by the DART System as part of its normal operations, typically running around 5-6% of trip requests. See Plaintiff's Exhibit 5, p. 10 [Table 1]. An assessment of the system performed by the Federal Transit Administration in 2001 concluded that the actual number of trip denials might actually have been higher. Id, at p. 12.

[13]While Plaintiff points to documents which, she argues, show she was unable to obtain employment because she was not able to obtain reliable transportation; see Plaintiff's Exhibits 3 and 4; these documents do not support Plaintiff's claim. Her Exhibit 3 [a Program Action Report from the South Carolina Vocational Rehabilitation Department] is dated October 2, 1997, during the period of her previous lawsuit. In any event, this document does not show that Plaintiff was refused employment because of a lack of transportation. Plaintiff's Exhibit 4 is a letter from her to Jim Gauthier dated November 12, 2000, in which Plaintiff complains about a scheduled ride arriving late. However, this letter does not reference any problems with employment. See also, Plaintiff's Reply Memorandum (Court Document No. 65), at p. 6. In reviewing Plaintiff's exhibits, the undersigned also considered an affidavit from Kevin Burns dated June 23, 2003 (Plaintiff's Exhibit 14). In this affidavit Burns attests that he "firmly believes" that Plaintiff was unable to



Therefore, Plaintiff's negligence claims should be dismissed.

## V.

### (Harassment Claim)

Plaintiff's harassment claim is set forth in her fourth cause of action as follows:

> The Defendants rather then consistently provide the driver training and proper securement belts demand that the Plaintiff transfer from her scooter to a van seat. The Plaintiff is physically unable to transfer with out considerable assistance. Plaintiff discussed this issue with Jim Gauthier, Laidlaw employee and DART manager, He is aware of Plaintiff's limitations and has even informed her that the drivers are NOT required to assist her in transferring from the scooter to a van seat. Yet, the DART supervisor, Francina Smith, will inevitably insist that Plaintiff transfer.

Amended Complaint, ¶ 36.

Plaintiff states in her memorandum in opposition to summary judgment (Court Document No. 65) that her harassment claim arises out of Smith's alleged harassment of her; specifically, Smith's requesting that Plaintiff transfer from her scooter to a van seat. Plaintiff's Memorandum, at pp. 26-27. This claim apparently has as its genesis the incident of March 10, 2001, when the DART driver had difficulty strapping Plaintiff's scooter down correctly. Plaintiff testified that when House and Smith arrived on the scene, Smith told her in a "nasty" tone that "its not safe to ride in your scooter, and you should get out of your scooter and transfer to a seat." Smith testified that she refused to move. Plaintiff's Deposition II, pp. 100-101, 107.

It is not initially clear on what legal basis this claim is being asserted. Although the undersigned has previously found that Plaintiff cannot assert a claim under the ADA or

---

serve to her full capacity with a volunteer nonprofit organization (Nature's Niche), of which she was a co-founder, because of her inability to "schedule reliable and specific time appointments for transportation with DART Transportation…." No specifics with regard to time, dates, or incidents are provided to support this general and conclusory statement, however, and as of the date of the affidavit this organization no longer even existed.



Rehabilitation Act for the reasons cited, it is possible that she could assert this claim under the South Carolina Bill of Rights for Handicapped Persons. <u>See</u> Section VI, <u>infra</u>. However, under standard discrimination caselaw; <u>see</u> <u>Cromer v. Greenwood Com'n of Public Works</u>, No. 92-CP-24-392, 1993 WL 328182, *4 (S.C.Com.Pl. Feb. 3, 1993) [applying federal discrimination caselaw to state anti-discrimination statutes]; in order to maintain a claim for harassment the alleged offending conduct must be sufficiently severe or pervasive to create an abusive environment.  While normally considered in the employment context, even if considered under Plaintiff's alleged facts, it is nevertheless clear that sporadic or isolated incidents are not sufficient to maintain a harassment claim. *Cf.* <u>See</u> <u>Hopkins v. Baltimore Gas & Electric Co.</u>, 77 F.3d 745, 754 (4th Cir. 1996) [anti-discrimination laws were not designed to create a remedy for all offensive language and conduct]; <u>Hartsell v. Duplex Products</u>, 123 F.3d 766, 773 (4th Cir. 1997); <u>see</u> <u>Guidry v. Zale Corp.</u>, 969 F.Supp. 988, 990 (M.D.La. 1997) [isolated comments do not constitute severe or pervasive conduct]; <u>Cram v. Lamson & Sessions</u>, 49 F.3d 466, 474 (8th Cir. 1995) [sporadic or casual comments are unlikely to support a hostile environment claim];j <u>Burkhart v. Washington Area Transit Auth.</u>, 112 F.3d 1207 (D.C.Cir. 1997) [General rudeness does not violate the ADA]; *cf.* <u>Guckenberger v. Boston University</u>, 957 F.Supp. 306, 314 (D.Mass. 1997) [Analyzing hostile environmental claims under § 504 and the ADA according to Title VII hostile work environment standards]. Smith's alleged offensive behavior, even if assumed to have occurred for purposes of summary judgment, was not severe or pervasive enough to maintain a harassment claim under the caselaw interpreting this cause of action in discrimination cases.

Finally, giving Plaintiff's Complaint the liberal construction to which she is entitled as a <u>pro se</u> litigant, her harassment claim could also possibly be considered as an intentional infliction



of emotional distress claim under state law.  However, even if considered under this legal theory, Defendant is still entitled to summary judgment on this claim.  Under South Carolina law, in order to recover on a claim for intentional infliction of emotional distress, Plaintiff must demonstrate that the Defendant's conduct was so extreme and outrageous that it exceeded all possible bounds of decency, and that the emotional distress suffered by the Plaintiff was so severe that "no reasonable [person] could be expected to endure it." See Wright v. Sparrow, 381 S.E.2d 503, 505 (S.C.Ct.App. 1989); Ford v. Hutson, 276 S.E.2d 776, 778 (S.C. 1981); Shipman v. Glenn, 443 S.E.2d 921 (S.C.Ct.App. 1994); Gattison v. South Carolina State College, 456 S.E.2d 414 (S.C.Ct.App. 1995). Smith's conduct as set forth in the allegations of Plaintiff's amended Complaint and in the other evidence presented to this Court fails to meet this high standard. Cf. Champion Road  Machinery International Corporation v. Jackson, 324 S.E.2d 79, 81 (1984), citing Hudson v. Zenith Engraving Company, Inc., 259 S.E.2d 812, 814 (1979) [In South Carolina, a plaintiff can only succeed on a claim for intentional infliction of emotional distress "where the conduct has been so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community."]; Johnson v. Dailey, 457 S.E.2d 613 (S.C. 1995) [teacher's allegations that her supervisor engaged in a campaign of retaliatory harassment against her after she reported his unlawful activities to authorities insufficient to support claim for outrage];  Jones v. Clinton, 990 F.Supp. 657, 678 (E.D.Ark. 1998) [conclusory statement by counselor that Plaintiff experienced various symptoms as a result of alleged sex discrimination insufficient to establish severe emotional distress component.]; Gattison, 456 S.E.2d at 416-417 [even verbally abusive accusations in the business setting do not give rise to a claim for intentional infliction of emotional distress]; Folkens v. Hunt, 348 S.E.2d 839, 845 (

24



S.C.Ct.App. 1986); Wright, 381 S.E.2d 505-506 [allegations that employer plotted to build a case to justify firing employee by loading her with responsibility while stripping her of authority, changing the way she should perform her duties and accusing her of not following directions, insufficient to assert a claim for intentional infliction of emotional distress]; Shipman, 443 S.E.2d at 922-923 [supervisor's conduct in ridiculing speech impediment of and threatening to fire an employee who had cerebral palsy did not provide a sufficient basis for intentional infliction of emotional distress]; Wilkes v. Young, 28 F.3d 1362, 1366 (4th Cir. 1994); Craig v. Andrew Aaron & Associates, Inc., 947 F.Supp. 208, 212-213 (D.S.C. 1996).

Therefore, Plaintiff's "harassment" claim is subject to summary judgment.

## VI.

### (Claim Under South Carolina Bill of Rights for Handicapped Persons)

The South Carolina Bill of Rights for Handicapped Persons, S.C.Code Ann. § 43-33-530, provides that "[n]o person may discriminate against a handicapped person with respect to public accommodation, public services or housing without reasonable justification...." See also S.C.Code Ann. § 43-33-570 [setting forth factors to be considered when determining "reasonable justification"]. There is no caselaw interpreting how this Act might apply in the context of this lawsuit. Indeed, as noted by Judge Anderson in his April 26, 2004 order on the motions to dismiss in Culler, only two cases can be found which even mention this statute, neither of which provides any guidance in the case at bar. See Cooper v. Lab. Corp. of Am. Holdings, 181 F.R.D. 312 (D.S.C. 1997)[mentioning that the plaintiff's complaint contained a cause of action under the South Carolina Bill of Rights for Handicapped Persons, upon which the parties reached a settlement], aff'd, 150 F.3d 376 (4th Cir. 1998); Love v. TPI Rests. Inc., C/A No. 0:91-2184-17, 1992 WL 402923 (D.S.C. April



8, 1992) [discussing the South Carolina Bill of Rights for Handicapped Persons in the employment context].

However, most Courts have held that, when dealing with discrimination cases, the standards through which these claims are to be considered are the same, no matter what anti-discrimination statute is at issue. *Cf.* Smaw v. Commonwealth of Virginia Department of State Police, 862 F.Supp. 1469, 1474 (E.D.Va. 1994) ["By design, the ADA standards mirror those of the Rehabilitation Act in this case....The emergence of the ADA does not create a new avenue for claims in the area of disability discrimination; rather, the ADA incorporates the existing language and standards of the Rehabilitation Act in this area."]; Hooven-Lewis v. Caldera, 249 F.3d 259, 268 (4th Cir. 2001) [same standards apply to ADA and Rehabilitation Act]; Orr v. Clyburn, 290 S.E.2d 804, 806 (S.C. 1982) [same standards used for evaluating claims under the South Carolina Human Affairs Law as are used for evaluating claims under the ADA]; Tyndall v. National Education Centers, 31 F.3d 209 (4th Cir. 1994); Cromer v. Greenwood Com'n of Public Works, supra ["The court notes that its ruling accords with the interpretation of federal employment discrimination laws upon which our state employment discrimination laws are modeled."]. Therefore, in the absence of any guidance by way of state judicial precedent or statutory instruction as to how the claims presented in this lawsuit should be considered in the context of the cited statute, the undersigned finds and concludes that Plaintiff's claim should be evaluated under the same standards used for considering claims under the ADA and/or the Rehabilitation Act.[14]

_____

[14]Although the undersigned has previously recommended dismissal of Plaintiff's Title III ADA claim, that was because Plaintiff could obtain no *relief* under that Act, as Title III only provides for injunctive or declaratory relief. The South Carolina Bill of Rights for Handicapped Persons, however, allows for monetary damages. See S.C.Code Ann. § 43-33-540. Therefore, Plaintiff could obtain relief under the South Carolina statute if a violation is shown. Similarly,



Defendant argues that Plaintiff's claim under this statute should be dismissed because there is no evidence that it discriminated against the Plaintiff on the basis of her disability by virtue of its operation of the DART System.  Defendant's argument is, essentially, that it could not have discriminated in the provision of services to the handicapped when that is essentially all that it did; i.e., provide services to the handicapped, not to anyone else.  Defendant argues that to establish a claim under this Act, Plaintiff would have to show that she was treated differently than other handicapped individuals who rode the DART System, and that Plaintiff has submitted no such evidence.  Conversely, Plaintiff argues that the DART System was not run efficiently, and that employees were undertrained and unwilling to provide meaningful assistance to her as a handicapped person. Plaintiff agues that she has a valid claim because she has been "denied access to public transportation services by Defendant[ ] because of [its] unwillingness through [its] agents to accommodate the Plaintiff's needs in order to be able to utilize the transportation facilities provided by the Defendant[ ] as is their civil liability.  Defendant's failure to provide for Plaintiff's needs as is required by the law have been such that she has been prohibited from enjoying her rights to the use of public transportation." Amended Complaint, ¶ 26.

While whether Plaintiff has a viable claim under the South Carolina Bill of Rights for Handicapped Persons under the facts presented, and considered in conjunction with the applicable caselaw, presents an interesting question, it is not one that this Court should or needs to resolve.  In light of the undersigned's previous finding that Plaintiff's federal causes of action are subject to dismissal, Plaintiff may only maintain this state law claim in this Court if she meets the requirements

---

while this Defendant is not subject to suit under the Rehabilitation Act because it was not a recipient of federal assistance, it is subject to suit under the cited state statute because it was a "person" providing public accommodation during the relevant time period.



for diversity jurisdiction. The diversity statute, 28 U.S.C. § 1332(a), requires complete diversity of parties and an amount in controversy in excess of seventy-five thousand ($75,000.00) dollars. While the Defendant appears to be a foreign corporation such as to meet the diversity of parties requirement of the statute, in light of the recommended dismissal of Plaintiff's other state law claims,[15] leaving this as the only potentially viable claim Plaintiff has presented, it is clear that the amount in controversy is not in excess of the required $75,000 (exclusive of interest and costs) such as to maintain this claim in this Court. 28 U.S.C.A. § 1332. Under S.C. Code Ann. § 43-33-540, if Plaintiff is successful in proving her claim that the Defendant has violated the South Carolina Bill of Rights for Handicapped Persons, she is only entitled to receive civil damages not to exceed five thousand ($5,000) dollars actual damages, plus her attorney's fees and costs.

Therefore, if the Court accepts the recommendation with respect to the remainder of Plaintiff's claims, she fails to meet the requirements of the federal diversity statute to continue with this claim in this Court. Further, dismissal of this remaining state law cause of action will allow the more appropriate court to rule on this exclusively, and apparently novel, state law claim and the issues raised by both the Plaintiff and the Defendant in their briefs. Dismissal of this claim will also not prejudice the Plaintiff, as federal law provides for tolling of statutes of limitation for state claims during the period they were pending in federal court and for thirty (30) days afterwards. See 28 U.S.C.A. § 1367(d); Jinks v. Richland County, 538 U.S. 456 (2003); Hedges v. Musco, et al., 204

---

[15]In addition to the other state law claims discussed, Plaintiff also references the South Carolina Victim and Witness Bill of Rights in her amended Complaint. See S.C.Code Ann. § 16-3-1505, et. seq.. Plaintiff may not bring a claim against the Defendant under this statute, however, as this statute concerns crime victims. See S.C.Code Ann. § 16-3-1510(1) [defining a "victim" as any individual who suffers harm "as the result of the commission or attempted commission of a criminal offense...."].



F.3d 109, 123-124 (3rd Cir. 2000); <u>Beck v. Prupis</u>, 162 F.3d 1090, 1099-1100 (11th Cir. 1998) ["a dismissal under section 1367 tolls the statute of limitations on the dismissed claims for 30 days"]; <u>Seabrook v. Jacobson</u>, 153 F.3d 70, 72 (2d Cir. 1998)["Section 1367(d) ensures that the plaintiff whose supplemental jurisdiction is dismissed has at least thirty days after dismissal to refile in state court."].

### Conclusion

Based on the foregoing, it is recommended that the Defendant's motion for summary judgment be **granted**, with prejudice, with respect to all claims asserted by the Plaintiff in this lawsuit with the exception of Plaintiff's claim under the South Carolina Bill of Rights for Handicapped Persons.  Plaintiff's claim under that Act should be **dismissed**, without prejudice, in order that she may pursue that claim in state court.

The parties are referred to the Notice Page attached hereto.

_____
Bristow Marchant

Columbia, South Carolina                United States Magistrate Judge

November 17, 2005

29

**<u>Notice of Right to File Objections to Magistrate Judge's Report and Recommendation</u>**
**<u>&</u>**
**<u>The Serious Consequences of a Failure to Do So</u>**

The parties are hereby notified that any objections to the attached Report and Recommendation (or Order and Recommendation) must be filed within ten (10) days of the date of its filing. 28 U.S.C. § 636 and Fed. R. Civ. P. 72(b). The time calculation of this ten-day period excludes weekends and holidays and provides for an additional three days for filing by mail. Fed. R. Civ. P. 6. Based thereon, this Report and Recommendation, any objections thereto, and the case file will be delivered to a United States District Judge fourteen (14) days after this Report and Recommendation is filed. <u>Advance Coating Technology, Inc. v. LEP Chemical, Ltd.,</u> 142 F.R.D. 91, 94 & n. 3 (S.D.N.Y. 1992). A magistrate judge makes only a recommendation, and the authority to make a final determination in this case rests with the United States District Judge. See <u>Mathews v. Weber,</u> 423 U.S. 261, 270-271 (1976); and <u>Estrada v. Witkowski,</u> 816 F. Supp. 408, 410 (D.S.C. 1993).

During the ten-day period, <u>but</u> <u>not</u> <u>thereafter,</u> a party must file with the Clerk of Court specific, written objections to the Report and Recommendation, if he wishes the United States District Judge to consider any objections. Any written objections must *specifically identify* the portions of the Report and Recommendation to which objections are made *and* the basis for such objections. Failure to file written objections shall constitute a waiver of a party's right to further judicial review, including appellate review, if the recommendation is accepted by the United States District Judge. See <u>United States v. Schronce,</u> 727 F.2d 91, 94 & n. 4 (4th Cir.), *cert. denied,* <u>Schronce v. United States,</u> 467 U.S. 1208 (1984); and <u>Wright v. Collins,</u> 766 F.2d 841, 845-47 & nn. 1-3 (4th Cir. 1985). Moreover, if a party files specific objections to a portion of a magistrate judge's Report and Recommendation, but does not file specific objections to other portions of the Report and Recommendation, that party waives appellate review of the portions of the magistrate judge's Report and Recommendation to which he did not object. In other words, a party's failure to object to one issue in a magistrate judge's Report and Recommendation precludes that party from subsequently raising that issue on appeal, even if objections are filed on other issues. <u>Howard v. Secretary of HHS,</u> 932 F.2d 505, 508-509 (6th Cir. 1991). See also <u>Praylow v. Martin,</u> 761 F.2d 179, 180 n. 1 (4th Cir.)(party precluded from raising on appeal factual issue to which it did not object in the district court), *cert. denied,* 474 U.S. 1009 (1985). In <u>Howard,</u> <u>supra,</u> the Court stated that general, non-specific objections are *not* sufficient:

> A general objection to the entirety of the [magistrate judge's] report has the same effects as would a failure to object. The district court's attention is not focused on any specific issues for review, thereby making the initial reference to the [magistrate judge] useless. * * * This duplication of time and effort wastes judicial resources rather than saving them, and runs contrary to the purposes of the Magistrates Act. * * * We would hardly countenance an appellant's brief simply objecting to the district court's determination without explaining the source of the error.

*Accord* <u>Lockert v. Faulkner,</u> 843 F.2d 1015, 1017-19 (7th Cir. 1988), where the Court held that the appellant, who proceeded *pro se* in the district court, was barred from raising issues on appeal that he did not specifically raise in his objections to the district court:

> Just as a complaint stating only 'I complain' states no claim, an objection stating only 'I object' preserves no issue for review. * * * A district judge should not have to guess what arguments an objecting party depends on when reviewing a [magistrate judge's] report.

<u>See</u> <u>also</u> <u>Branch v. Martin,</u> 886 F.2d 1043, 1046 (8th Cir. 1989)("no de novo review if objections are untimely or general"), which involved a *pro se* litigant; and <u>Goney v. Clark,</u> 749 F.2d 5, 7 n. 1 (3rd. Cir. 1984)("plaintiff's objections lacked the specificity to trigger *de novo* review"). This notice, hereby, apprises the parties of the consequences of a failure to file specific, written objections. See <u>Wright,</u> <u>supra,</u>; and <u>Small v. Secretary of HHS,</u> 892 F.2d 15, 16 (2nd Cir. 1989). Filing by mail pursuant to Fed. R. Civ. P. 5 may be accomplished by mailing addressed as follows:

**Larry W. Propes, Clerk**
**United States District Court**
**901 Richland Street**
**Columbia, South Carolina 29201**
